# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| RYAN MURPHY, Derivatively on Behalf of TARGET CORPORATION,<br><br>    Plaintiff,<br><br>v.<br><br>BRIAN C. CORNELL, DAVID P. ABNEY, DOUGLAS M. BAKER, JR., GEORGE S. BARRETT, GAIL K. BOUDREAUX, ROBERT L. EDWARDS, DONALD R. KNAUSS, CHRISTINE A. LEAHY, MONICA C. LOZANO, GRACE PUMA, DERICA W. RICE, DIMITRI L. STOCKTON, MELANIE L. HEALEY, MARY E. MINNICK, and MICHAEL J. FIDDELKE,<br><br>    Individual Defendants,<br>-and-<br><br>TARGET CORPORATION,<br><br>    Nominal Defendant. | Case No.<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Ryan Murphy ("**Plaintiff**"), by his attorneys, derivatively on behalf of Nominal Defendant Target Corporation ("**Target**" or the "**Company**"), submits this Verified Stockholder Derivative Complaint for breach of fiduciary duties, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "**Exchange Act**").

Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("**SEC**") and a review of news reports, press releases, and other publicly available sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Target against members of its board of directors (the "**Board**") and members of upper management. The wrongdoing alleged herein has caused substantial economic damage to Target as well as damage to Target's reputation, goodwill, and standing in the business community, and has exposed Target to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have also damaged Target in the form of, among other things, millions of dollars in losses to the Company's market capitalization. This action seeks to remedy wrongdoing committed by Target's directors and officers from March 9, 2022, through the present (the "**Relevant Period**").

2.     Target is a retail corporation that operates nearly 2,000 stores

throughout the United States, offering "everyday essentials and fashionable, differentiated merchandise at discounted prices."[1] The Company's stated purpose is "to help all families discovery the joy of everyday life."[2]

3.    Following the appointment of Brian C. Cornell ("**Cornell**") as Chief Executive Officer ("**CEO**") in 2015, Target intensified its focus on environmental, social, and governance ("**ESG**") along with diversity, equity, and inclusion ("**DEI**") initiatives, embedding these into the Company's strategic business plan and corporate objectives.

4.    In June 2015, Target created a campaign to honor Pride Month – the annual celebration of the Lesbian, Gay, Bisexual, Transgender, and Queer ("**LGBTQ**") community – which included the publication of a "Pride Manifesto" and accompanying video transcript. The following year, Target announced its opposition to a North Carolina transgender bathroom law, stating that its employees and customers could use any bathroom or fitting room that conformed with their gender identity.

5.    Target faced significant backlash from customers and investors after the release of the publications, with warnings from shareholders, consumer groups, and influencers that continuing with similar initiatives could lead to a loss of customers. In response to Target's stance on the North

---

[1] Target Corporation, Annual Report (Form 10-K) (Mar. 13, 2024).

[2] *Id.*

Carolina bathroom law, in particular, one million customers boycotted the Company. The boycott had both immediate and lasting effects on Target. The Company experienced three consecutive quarters of declining sales after opposing the North Carolina law, and reports indicated a noticeable decline in foot traffic, although Target's leadership maintained that the financial impact was not significant at the time. They also responded by investing in single-stall bathrooms to provide more privacy and potentially mitigate some backlash.

6.      Nevertheless, in May 2023, Target initiated a children-and-family-themed Pride Month sales and marketing campaign, placing displays at the front of stores nationwide and selling Pride-themed merchandise ranging from home goods to books to clothing for infants.

7.      Consumers across the country were outraged and boycotted Target, causing the Company to lose at least $10 billion in market capitalization between May 18, 2023 and May 23, 2023 – leading the stock to experience its longest losing streak in 23 years. The boycott also caused Target's comparable sales to fall for the first time in six years. Ultimately, the Company was forced to acknowledge the backlash, walk back its Pride Month campaign, and remove merchandise in response to consumer boycotts.

8.      Despite the Company's assurances that it was overseeing and disclosing risks stemming from its ESG and DEI initiatives, the Company failed to disclose the significant risk of consumer boycotts – and a resulting

loss of profits and shareholder value, not to mention loss goodwill and other intangible harm – that could result from its embrace of social policies to which a substantial portion of its customers took exception.

9.    In addition to suffering significant reputational damage, the Company lost approximately $25 billion in market capitalization during the second half of 2023 as a result of its failure to disclose the known risk of widespread consumer boycotts in response to Target's Pride Month campaign.

10.    As a result of the foregoing, Defendants are parties to a related securities action, captioned *Craig v. Target Corporation, et al.*, No. 2:23-cv-00599-JLB-KCD (M.D. Fla.) (the "**Securities Action**"). This Court recently denied Defendants' motion to dismiss the Securities Action finding, *inter alia*, that the plaintiffs had stated actionable claims for knowing violations of the federal securities laws, thereby exposing Defendants to financial harm and substantial risk of liability in this action.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raises federal questions under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

13.     The court has personal jurisdiction over each defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this District because the Company and the Individual Defendants have been involved in business in this District. Further, Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

15.     Plaintiff Ryan Murphy is and has continuously been a stockholder of Target during the wrongdoing complained of herein.

### Nominal Defendant

16.     Defendant Target is a Minnesota corporation with principle executive offices located in Minneapolis, Minnesota. Target's shares trade on the New York Stock Exchange ("**NYSE**") under the ticker symbol "TGT."

### Current Director Defendants

17.     Defendant Cornell has served as Target's CEO and Chair of the

Board since August 2014. During the Relevant Period, Cornell received over $36 million in total compensation from the Company.

18.     Defendant David P. Abney ("**Abney**") has served as a member of the Board since 2021. He is currently a member of the Audit & Risk Committee and the Infrastructure & Finance Committee. During the Relevant Period, Abney received over $600,000 in total compensation from the Company.

19.     Defendant Douglas M. Baker, Jr. ("**Baker**") has served as a member of the Board since 2013. He is currently a member of the Compensation & Human Capital Management Committee and the Governance & Sustainability Committee. During the Relevant Period, Baker received over $600,000 in total compensation from the Company.

20.     Defendant George S. Barrett ("**Barrett**") has served as a member of the Board since 2018. He is currently Chair of the Governance & Sustainability Committee and a member of the Compensation & Human Capital Management Committee. During the Relevant Period, Barrett received over $600,000 in total compensation from the Company.

21.     Defendant Gail K. Boudreaux ("**Boudreaux**") has served as a member of the Board since 2021. She is currently a member of the Audit & Risk Committee and the Infrastructure & Finance Committee. During the Relevant Period, Boudreaux received over $600,000 in total compensation from the Company.

22.     Defendant Robert L. Edwards ("**Edwards**") has served as a member of the Board since 2015. He is currently a member of the Audit & Risk Committee, on which he served as Chair until June 2024. He is also a member of the Infrastructure & Finance Committee. During the Relevant Period, Edwards received over $600,000 in total compensation from the Company.

23.     Defendant Donald R. Knauss ("**Knauss**") has served as a member of the Board since 2015. He is currently Chair of the Infrastructure & Finance Committee and a member of the Compensation & Human Capital Management Committee. During the Relevant Period, Knauss received over $600,000 in total compensation from the Company.

24.     Defendant Christine A. Leahy ("**Leahy**") has served as a member of the Board since 2021. She is currently a member of the Compensation & Human Capital Management Committee and the Governance & Sustainability Committee. During the Relevant Period, Leahy received over $600,000 in total compensation from the Company.

25.     Defendant Monica C. Lozano ("**Lozano**") has served as a member of the Board since 2016 and as Lead Independent Director since 2021. She is currently Chair of the Compensation & Human Capital Management Committee and a member of the Governance & Sustainability Committee. During the Relevant Period, Lozano received over $700,000 in total compensation from the Company.

26.     Defendant Grace Puma ("**Puma**") has served as a member of the Board since 2022. She is currently a member of the Audit & Risk Committee and the Infrastructure & Finance Committee. During the Relevant Period, Puma received over $500,000 in total compensation from the Company.

27.     Defendant Derica W. Rice ("**Rice**") has served as a member of the Board since 2020. He is currently a member of the Audit & Risk Committee and the Infrastructure & Finance Committee. Defendant Rice also previously served on the Board from September 2007 to January 2018. During the Relevant Period, Rice received over $600,000 in total compensation from the Company.

28.     Defendant Dimitri L. Stockton ("**Stockton**") has served as a member of the Board since 2018. He is currently Chair of the Audit & Risk Committee and a member of the Governance & Sustainability Committee. During the Relevant Period, Stockton received over $600,000 in total compensation from the Company.

29.     Collectively, Defendants Cornell, Abney, Baker, Barrett, Boudreaux, Edwards, Knauss, Leahy, Lozano, Puma, Rice, and Stockton may be referred to herein as the "**Current Director Defendants**."

**Former Director Defendants**

30.     Melanie L. Healey ("**Healey**") served as a member of the Board from 2015 until June 2023. Prior to her departure from the Board, she was a

member of the Compensation & Human Capital Management Committee and the Governance & Sustainability Committee.

31.    Defendant Mary E. Minnick ("**Minnick**") served as a member of the Board from 2005 until June 2022. Prior to her departure from the Board, she was Chair of the Infrastructure & Finance Committee.

32.    Together, Defendants Healey and Minnick may be referred to herein as the "**Former Director Defendants**."

**Officer Defendant**

33.    Defendant Michael J. Fiddelke ("**Fiddelke**") has served as the Company's Executive Vice President and Chief Operating Officer ("**COO**") since February 2024 and as the Company's Chief Financial Officer ("**CFO**") since November 2019. He has worked in various roles since he joined the Company as an intern in 2003. During the Relevant Period, Fiddelke received over $9 million in total compensation from the Company.

34.    The Current Director Defendants, the Former Director Defendants, and the Individual Defendants are referred to herein as the "**Individual Defendants**."

## SUBSTANTIVE ALLEGATIONS

35.    Incorporated in 1902, Target is one of the largest retailers in the United States, offering a variety of discounted merchandise at thousands of stores throughout the country.

10

36.     Throughout the Relevant Period, the Company's Annual Reports filed with the SEC have noted that Target's "corporate purpose is to help all families discover the joy of everyday life."[3]

37.     In August 2014, Defendant Cornell became "the first outsider ever tapped to lead the [C]ompany in its more than 100-year history"[4] and, shortly thereafter, Target began to emphasize ESG and DEI initiatives in its business and corporate culture, with the stated purpose of benefitting various Company "stakeholders."

38.     In 2019, Defendant Cornell, in his capacity as the Chairman and CEO of Target, signed the Business Roundtable's "Statement on the Purpose of a Corporation" (the "**BRT Statement**"), in which he pledged to make "a fundamental commitment to <u>all</u> of our stakeholders," noting that "[e]ach of our stakeholders is essential," and that Target was committed "to deliver[ing] value to all of them."

39.     Although corporate law traditionally requires that directors give shareholder interests primacy over those of other stakeholders, Target has explicitly stated that the Board's "governance and management systems…fully implement the [BRT] Statement of Purpose." Indeed, the Company went so far

---

[3] *See, e.g.*, Target Corporation, Annual Report (Form 10-K) (Mar. 13, 2024).

[4] TCB Staff, *Target CEO Brian Cornell is TCB's 2019 Person of the Year*, Twin Cities Business (Sept. 16, 2019), available at https://tcbmag.com/target-ceo-brian-cornell-is-tcba%C2%80%C2%99s-2019-person-of-the-year/.

as stating that the Board's "ongoing consideration of various stakeholders in its governance decisions and oversight of the Company's business and strategy" was "core to the Company's governance."

40.    Most if not all of the initiatives that Target has implemented in response to "stakeholder" interests correspond directly to "progressive" positions on ESG and DEI matters. For example: (i) in 2020, Target committed to an expressly race-based hiring plan by pledging to "increase representation of Black team members across the Company by 20 percent" over three years; (ii) after the Supreme Court's 2022 decision in *Dobbs v. Jackson Women's Health Organization*, Target expanded its employee-benefit plans to compensate employees for out-of-state travel necessary to obtain abortions; and (iii) Target welcomes employees to "use the restroom or fitting room facility that corresponds with their gender identity."

**Target's LGBTQ Activism Consistently Provokes Backlash**

41.    For over a decade, Target has actively supported the LGBTQ community in particular, partnering with several pro-LGBTQ organizations on ESG and DEI initiatives and earning a reputation as a corporation with "forward-looking policies and benefits for gay and lesbian employees." Target has also touted its "PRIDE+ Business Council," a group of Target employees

who work to "represent[]…the LGBTQIA+ community at Target."[5]

42.    In 2012, Target launched its first reported LGBTQ-themed merchandise and announced it would donate the proceeds of merchandise sales to the Family Equality Council, an  LGBTQ activist group. Merchandise included shirts in rainbow-hued designs bearing slogans such as "Love is love" and "Harmony."

43.    In response, Tony Perkins, the President of the Family Research Council, a  group promoting a "biblical worldview," stated that Target's campaign was not "'very smart,' especially in conservative states, where [Target] does the biggest business" and called on his listeners to "Let Target know that its agenda isn't your style. Log on to target.com, scroll down, and click 'Contact Us.'"

44.    The American Family Association, a group promoting "biblical, family values in society and government," released an "action alert" stating "Target is joining President Obama in ramming same-sex marriage down the throats of the American people" and calling on readers to "[s]end an email to Target['s] Chairman" to "[l]et him know that a majority of Americans oppose

---

[5] "**LGBTQIA+**" refers to "Lesbian, Gay, Bisexual, Transgender, Queer or Questioning, Intersex, and Asexual/Aromantic. The "+" represents the many other identities that may be part of the community such as pansexual, agender, non-binary, gender fluid, etc., as well as allies of the community." http://bit.ly/3PFuGGg.

same-sex marriage and are able to use their pocketbooks to voice their opposition to companies that support it."

45.    In August 2014, after years of remaining neutral on the issue, Target announced that it had signed an amicus brief "in support of marriage equality." In response, a number of groups opposed to that position organized a consumer protest and urged consumers to boycott the Company.

46.    In 2015, Target announced that it would phase out "gender-based signage" on children's toys and other merchandise because "guests have raised important questions about a handful of signs in our stores based on gender."

47.    Again, social and political commentators called on consumers to respond. The Reverend Franklin Graham, for example, published a Facebook post that was liked by over 102,000 users, urging his followers to let Target "know that you are perfectly willing to shop where the genders God created are appreciated."

48.    In April 2016, after North Carolina enacted legislation limiting multi-occupancy bathrooms and locker rooms to occupants of the same sex, as defined on their birth certificates, Target responded to calls for action from LGBTQ stakeholders by publishing a blog post responding to "proposed laws in several states." The blog post declared that Target welcomed "transgender team members and guests to use the restroom or fitting room facility that corresponds with their gender identity."

14

49.     The backlash was swift and caused significant losses for the Company. In response to Target's transgender bathroom policy, more than 1.5 million people pledged to boycott Target and a number of protesters attended the Company's June 2016 shareholder meeting to speak out against the policy. Moreover, Target's same-store sales growth fell in each of the three quarters following the Company's publication of the blog post – the first such decline in years.

50.     In addition to declining sales growth, Target was forced to "spend $20 million to add private bathrooms to the stores that didn't have them" and "embark[] on a multibillion-dollar revamp" of the stores that were falling behind as a result. After an internal review, Target executives determined that the 2016 boycott "was the tipping point for some stores" in several markets, leading Target to close those stores.

51.     Although Defendant Cornell publicly defended the decision to publish the blog post, he reportedly admitted to Target staff that the Company "didn't adequately assess the risk, and the ensuring backlash was self-inflicted." He maintained, however, that "it was too late to reverse course."

52.     Target has continued to host Pride Month campaigns and offer Pride-themed merchandise every year, despite this "self-inflicted" backlash and declines in Target's stock price during Pride Month in three of the last four years.

53.    Notwithstanding management's admitted "self-inflicted" failure to adequately assess the risk of backlash, Target dramatically expanded its LGBTQ activism with its 2023 Pride Month campaign – and failed to warn shareholders of the corresponding risk for severe reputational and financial damage to the Company.

## Target Issues Materially False & Misleading Statements

54.    On March 9, 2022, Target filed its Annual Report on Form 10-K (the "**2021 10-K**") with the SEC. With regard to the risks stemming from the Company's ESG and DEI initiatives, the 2021 10-K stated, in relevant part, as follows:

> We believe that one of the reasons our shareholders, guests, team members, and vendors choose Target is the reputation we have built over many years for serving those constituencies and the communities in which we operate. To be successful in the future, we must continue to preserve Target's reputation. Our reputation is based in large part on perceptions, both about us and others with whom we do business, and broad access to social media makes it easy for anyone to provide public feedback that can influence perceptions of Target. It may be difficult to control negative publicity, regardless of whether it is accurate. Target's responses to crises and our position or perceived lack of position on environmental, social, and governance (ESG) matters, such as sustainability, responsible sourcing, and diversity, equity, and inclusion (DE&I), and any perceived lack of transparency about those matters, could harm our reputation. While reputations may take decades to build, ***negative incidents involving us or others with whom we do business can quickly erode***

16

> ***trust and confidence and can result in consumer boycotts, workforce unrest or walkouts, government investigations, or litigation.*** For example, we have a limited ability to end our relationship with CVS, which leases space to operate their clinics and pharmacies within our stores. If our guests have negative experiences with or unfavorably view CVS or other companies with whom we have relationships, it could cause them to reduce or stop their business with us. ***Negative reputational incidents could adversely affect our business and results of operations, including through lost sales, loss of new store and development opportunities, or team member retention and recruiting difficulties.***

(Emphasis added).

55.    The 2021 10-K was signed by Defendants Cornell and Fiddelke in their capacity as CEO and CFO, respectively, and was accompanied by certifications from Defendants Cornell and Fiddelke pursuant to Section 302 of the Sarbanes-Oxley Act of 2022 (the "**SOX Certifications**"), attesting to the accuracy of the filing.

56.    The statements in the 2021 10-K were also incorporated by reference into Target's quarterly reports on Form 10-Q filed with the SEC on May 27, 2022, August 6, 2022, and November 23, 2022, with each report stating that "[t]here have been no material changes to the risk factors described" in the 2021 10-K. These quarterly reports were also accompanied by SOX Certifications from Defendants Cornell and Fiddelke.

57.    On April 25, 2022, Target filed a Proxy Statement on Schedule 14A

with the SEC (the "**2022 Proxy**"), which described the Board's key role in risk oversight as follows:

### Risk oversight

Oversight of the various risks we face in implementing our strategy is an integral and continuous part of the Board's oversight of our business. The Board, each Committee, and management have specific roles and responsibilities with respect to those risks.

### The Board and its Committees

The Board provides oversight of overall risks, with emphasis on strategic risks, which occurs as an integral and continuous part of the Board's oversight of our business and seeks to ensure that management has processes in place to appropriately manage risk. For example, our principal strategic risks are reviewed as part of the Board's regular discussion and consideration of our strategy, including the development and monitoring of specific initiatives and their overall alignment with our strategy. Similarly, at every meeting the Board reviews the principal factors influencing our operating results, including the competitive environment, and discusses with our senior executive officers the major events, activities, and challenges affecting Target.

The Audit & Risk Committee oversees our enterprise risk management program and periodically reviews our approach to risk identification, assessment, and mitigation strategies with the Board to facilitate coordination with the activities of the Board and other Committees. The Chief Legal & Risk Officer provides the Audit & Risk Committee with regular updates on the enterprise risk management program and the status of key risks facing the business. The Audit & Risk Committee also regularly receives updates on key risk areas from other members of management with primary responsibility for managing those risk areas,

and regularly reviews legal and regulatory risk, compliance, and ethics matters.

58.    The 2022 Proxy also emphasized the significance of "ESG matters" to the Board's risk oversight, and described the specific oversight and responsibilities of each Committee through the following graphic:



59.    Although the 2022 Proxy was clear that the full Board, the Audit & Risk Committee, and the Governance & Sustainability Committee, were all responsible for oversight of various "ESG matters," only the Governance & Sustainability Committee was described as overseeing "social" and "political" issues and risks.

60.    On March 8, 2023, the Company filed its Annual Report on Form 10-K with the SEC (the "**2022 10-K**"), purporting to disclose "the material

risks" faced by Target. Unlike the 2021 10-K, however, the 2022 10-K did ***not*** address the risk of reputational harm in connection with the Company's ESG and/or DEI initiatives. Instead, the 2022 10-K indicated that there was a risk to the Company if it failed to "achieve" its "goals and initiatives" with regard to ESG and DEI matters stating, in relevant part, as follows:

> [S]takeholder expectations regarding environmental, social, and governance matters continue to evolve and are not uniform. We have established, and may continue to establish, various goals and initiatives on these matters, including with respect to diversity, equity, and inclusion topics. We cannot guarantee that we will achieve these goals and initiatives. Any failure, or perceived failure, by us to achieve these goals and initiatives or to otherwise meet evolving and varied stakeholder expectations could adversely affect our reputation and result in legal and regulatory proceedings against us.

61.    The 2022 10-K was signed by Defendants Cornell and Fiddelke in their capacity as CEO and CFO, respectively, who also signed SOX Certifications attesting to the accuracy of the filing.

62.    The statements in the 2022 10-K were also incorporated by reference into Target's quarterly reports on Form 10-Q filed with the SEC on May 26, 2023 and August 25, 2023, with each report stating that "[t]here have been no material changes to the risk factors" described in the 2022 10-K. These quarterly reports were also accompanied by SOX Certifications from Defendants Cornell and Fiddelke.

63.     On May 1, 2023, the Company filed a Proxy Statement on Schedule 14A with the SEC (the "**2023 Proxy**"), which described the Board's key role in risk oversight in nearly identical terms as those used in the 2022 Proxy:

### Risk oversight

Oversight of the various risks we face in implementing our strategy is an integral and continuous part of the Board's oversight of our business. The Board, each Committee, and management have specific roles and responsibilities with respect to those risks.

### The Board and its Committees

The Board provides oversight of overall risks and seeks to ensure that our Leadership Team has processes in place to appropriately manage risk. Strategic risks are emphasized within that overall risk oversight responsibility because they are an integral and ongoing part of the Board's oversight of our business. For example, our principal strategic risks are reviewed as part of the Board's regular discussion and consideration of our strategy, including the development and monitoring of specific initiatives and their overall alignment with our strategy. Similarly, at every meeting the Board reviews the principal factors influencing our operating results, including the competitive environment, and discusses with our Leadership Team the major events, activities, and challenges affecting Target.

64.     The 2023 Proxy also emphasized the significance of "ESG matters" to the Board's risk oversight, and described the Board's allocation of oversight of those matters throughout the Board and its committees as follows:

### Sustainability & ESG

We engage with a diverse group of stakeholders

around the world, including the people who manufacture the products we sell, the Team Members who welcome our guests, the communities where we work, the nonprofits that work with us, and the investors who make our work possible. Their perspectives are one of a variety of factors we consider as we analyze which ESG matters to prioritize in determining and evaluating our sustainability strategy. . . .

65. According to the 2023 Proxy, in order to account for "the breadth of ESG matters for a company of [Target's] size and scale," oversight of "ESG matters" was "allocated throughout the Board and its Committees" as follows:

| Responsible party | Oversight areas for ESG matters |
|---|---|
| Board | • Sustainability and ESG strategy (through oversight of our business strategy and annual strategic priorities)<br>• Sustainability and ESG risks (through oversight of our business strategy and top enterprise risks)<br>• Reputation management<br>• Crisis management and response<br>• Organizational team health |
| Audit & Risk Committee | • Compliance and ethics<br>• Supply chain ESG matters, including vendor human capital and responsible sourcing practices<br>• Cybersecurity and information security<br>• Privacy<br>• Product and food safety |

| Responsible party | Oversight areas for ESG matters |
|---|---|
| Governance & Sustainability Committee | • Overall approach to significant sustainability and ESG matters (including strategy, prioritization, monitoring, and external reporting)<br>• Environmental stewardship practices (including climate and energy, waste, natural resources, and chemicals)<br>• Social and political issues and risks not allocated to other Committees<br>• Philanthropy and community engagement<br>• Policies and practices regarding public policy advocacy and political activities |
| Compensation & Human Capital Management Committee | • DE&I<br>• Culture and Team Member engagement<br>• Pay equity<br>• Broad-based compensation and benefits<br>• Growth and development<br>• Purpose and values |

66. The 2023 Proxy also assured investors that the Governance & Sustainability Committee oversaw the "social and political issues and risks" of Target's ESG matters.

67. The statements contained in paragraphs ¶¶54-66 were materially false and misleading because they failed to disclose the risk of consumer

22

backlash to the Company's ESG and DEI initiatives, including but not limited to Target's Pride Month campaigns – notwithstanding that management had firsthand experience with such backlash damaging the Company. Among other things, the Company failed to disclose the risk of widespread boycotts and the financial damage to the Company that could result therefrom. The statements above were also materially false and misleading because the Board and its committees were not properly overseeing ESG risks or "political and social risks," as demonstrated by the severe backlash resulting from the 2023 Pride Month campaign.

### Target's 2023 Pride Month Campaign Provokes Swift and Dramatic Backlash

68.   In May 2023, immediately after publishing the false and misleading 2023 Proxy, Target embarked upon the most extensive and prominent Pride Month campaign in the Company's history.

69.   Target's website listed over 100 products under the category "LGBT Pride: Kids' Clothing" and the Company's brick-and-mortar stores offered a wide array of LGBTQ merchandise in the children's section. The Company also sold children's books with titles such as "I'm Not a Girl," "Are You a Boy or Are You a Girl?" and "The Hips on the Drag Queen Go Swish, Swish, Swish."

70.   Target also stocked other controversial merchandise as part of its

Pride Month campaign, including merchandise from "Satanist-Inspired" brand Abprallen and extra-extra-small "swimsuits with clothing tags that describe the items as having a 'light binding effect' on breasts and 'tuck-friendly construction' for male genitalia" with "extra crotch coverage."

71.    Many consumers expressed outrage over the foregoing merchandise, uploading videos online of Target merchandise they found offensive and calling for boycotts. By May 24, 2023, videos on TikTok with the hashtag #boycotttarget had attracted nearly 25 million views.

72.    Ultimately, consumer backlash prompted the largest boycott and reduced demand for Target in recent history, leading to billions of dollars in investor losses.

73.    On May 17, 2023, prior to the complete disclosure of the 2023 Pride Month campaign and related consumer backlash, Target's stock price was priced at around $160.96.

74.    News reports have indicated that Target lost at least $10 billion in market valuation between May 18, 2023 and May 28, 2023 due to consumer outrage over the 2023 Pride Month campaign. By October 6, 2023, Target's market capitalization had decreased by more than $25 billion, with its stock price hitting a low of $105.01 per share. Over a year later, the Company's stock price has still not recovered to its pre-campaign level.

75.    JPMorgan downgraded Target's stock, citing "recent company

controversies" as part of the explanation for turning "Target's traffic negative after an impressive run of 12 consecutive positive quarters." Wells Fargo analysts said the 2023 Pride Month campaign "'generated a meaningful amount of negative in-store and social media attention' that adds uncertainty to its already challenged near-term prospects and may be hurting store traffic."

76.    On May 24, 2023, Target management issued a press release, "Target Statement on 2023 Pride Collection," in which it both announced changes to its Pride Month campaign due to consumer backlash and doubled down on its commitment to the cause:

> For more than a decade, Target has offered an assortment of products aimed at celebrating Pride Month. Since introducing this year's collection, we've experienced threats impacting our team members' sense of safety and well-being while at work. Given these volatile circumstances, we are making adjustment to our plans, including removing items that have been at the center of the most significant controversial behavior. Our focus now is on moving forward with our continuing commitment to the LGBTQIA+ community and standing with them as we celebrate Pride Month and throughout the year.

77.    Just days after issuing this press release, Target expanded the number of stores pulling back Pride merchandise beyond just the stores purportedly receiving "threats" and also pulled back specific items across the entire United States. According to a May 27, 2023 *Business Insider* article, "[e]mployee sources in six states" indicated that "the order came down on

Thursday to stores across the US, less than a week after a similar directive to Target locations in Southern states where front-end Pride displays were taken down and moved to low-traffic areas of the store." The employees also stated that Target specifically stopped selling its line of "transgender-friendly swimsuits."

78.    On August 16, 2023, Target reported its earnings for the second quarter of 2023, which included the months of May, June, and July during which the Pride Month campaign occurred. Target reported that its comparable sales fell for the first time in six years, declining 5.4 percent in the quarter.

79.    During the earnings call hosted by the Company that same day, Target's Chief Growth Officer, Christina Hennington, called "the strong reaction to this year's Pride assortment" a "headwind" that negatively affected earnings. Defendant Fiddelke stated, in relevant part:

> ***Total revenue was down 4.9% in the second quarter. Total sales also decreased by that same amount while other revenue grew 1.3%.*** Within other revenue, we continue to see strong growth from our Roundel ad business, which offset declines in credit card profit sharing and other small income items compared with last year. ***Comparable sales were down 5.4% in Q2, reflecting a 4.8% decline in traffic.***
>
> Among the factors affecting our top line performance, comps and discretionary categories continue to reflect challenging trends in the industry, which softened

further in Q2. A second factor was lower inflation in food, beverages and essentials as we compare to over peak inflation a year ago. ***Furthermore, traffic and top line trends were affected by the reaction to our Pride assortment, which launched in the middle of May.*** And lastly, our results reflected the comparison over last year's clearance and promotional activity, which affected weekly comp trends in certain categories, particularly in the digital channel. While each of these factors played a role in the quarter, it's not possible to reliably quantify the separate impact of each one.

(Emphasis added).

80.    On November 15, 2023, Target reported its earnings for the third quarter of 2023, noting that comparable sales continued to fall, declining 4.9%, and that digital comparable sales fell 6%.

81.    In an interview with CNBC that month, Defendant Cornell admitted that Target exposed itself to consumer backlash because "we set the presentation earlier than everyone else" by beginning in May, and because the display "was very prominent." He stated that Target would "manage these moments…very differently" going forward, including "curat[ing] our assortment much more carefully" and presenting Pride merchandise so that it is not "the first thing you see in our store" but rather is presented "appropriately."

## FIDUCIARY DUTIES

82.    By reason of their positions as officers of the Company, each of the

Individual Defendants owed and continues to owe Target and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Target in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Target and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

83.    Each Individual Defendant owed and continues to owe Target and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

84.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Target, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Target, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock

would be based on truthful and accurate information.

85.    To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a)    Ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Florida and the United States, and pursuant to Target's own Corporate Governance Guidelines;

(c)    Conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(d)    Remain informed as to how Target conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and

make such disclosures as necessary to comply with applicable laws;

(e)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Target and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)    Maintain and implement an adequate and functioning system of internal, legal, financial, and management controls, such that Target's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(g)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)    Truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

86.    The Individual Defendants, because of their advisory, executive, managerial, and directorial positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Target.

87.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Target and were at all times acting within the course and scope of such agency.

**Duties Pursuant to the Company's Corporate Governance Guidelines**

88.    The Individual Defendants, as officers and/or directors of Target, were bound by the Company's Corporate Governance Guidelines, including the Director Code of Ethics.

89.    The Director Code of Ethics states that it "is intended to focus the Board and each Director on areas of ethical risk, provide guidance to Directors to help them recognize ethical issues and understand how to report unethical conduct, and help foster a culture of honesty and accountability."

90.    In a section titled "Conflicts of Interest," the Director Code of Ethics states, in relevant part:

A Director must avoid conflicts of interest with the Corporation. A conflict of interest can occur when a Director's personal or business interests are adverse to the interest of the Corporation or when a Director (or a Director's family member) receives an improper personal benefit as a result of the Director's position as a member of the Board. A Director's personal or business interests include the interests of the Director's family members or organizations with which the Director or the Director's family members have a material relationship.

91. In the section titled "Compliance with Law, Rules, and Regulations; Fair Dealing," the Director Code of Ethics states that "directors should comply with all applicable laws, reuls, and regulations" and that directors "should deal fairly with Target's team members, guests, suppliers, and competitors."

## **Duties Pursuant to the Governance & Sustainability Committee Charter**

92. In addition to these duties, Defendants Baker, Barrett, Healey, Leahy, Lozano, and Stockton, who served on the Governance & Sustainability Committee during the Relevant Period, owed specific duties to Target pursuant to the Governance & Sustainability Charter, which clearly outlined the Committee's responsibilities with regard to oversight of ESG and political and social risk, as follows:

**ESG & Corporate Responsibility Matters.** Oversee the Corporation's overall approach to environmental, social & governance and corporate

responsibility matters, including:

* * *

- identification of the ESG-related topics that are most relevant and important to the Corporation and any goals or aspirations related thereto;

* * *

- social and political issues and risks impacting the Corporation (other than the human capital matters overseen by the Compensation & Human Capital Management Committee and the supply chain matters overseen by the Audit & Risk Committee);

- the Corporation's philanthropy and community engagement activities;

- external reporting on ESG and corporate responsibility matters.

**<u>Public Advocacy and Political Activities.</u>** Oversee the Corporation's policies and practices regarding public policy advocacy and political activities, including the process for selecting issues for engagement, lobbying activities, political contributions with corporate funds (including support of other organizations that may engage in political activity), and the activities of any political action committee organized by the Corporation.

93. As described by the charter, the Governance & Sustainability Committee's oversight responsibility for "social and political issues and risks impacting the Corporation" is distinct from the Committee's other responsibilities, including the Committee's oversight of the "identification of ESG-related topics," "philanthropy and community engagement," and even

"public advocacy and political activities."

94.    Moreover, the charter indicates that the Governance & Sustainability Committee's oversight responsibility for "social and political issues and risks impacting the Corporation" is also distinct from "human capital matters overseen by the Compensation & Human Capital Management Committee" and "supply chain matters overseen by the Audit & Risk Committee."

## Duties Pursuant to the Audit & Risk Committee Charter

95.    In addition to complying with the Director Code of Ethics, Defendants Abney, Boudreaux, Edwards, Puma, Rice, and Stockton, who served on the Audit & Risk Committee during the Relevant Period, owed specific duties to Target pursuant to the Audit & Risk Committee Charter, which described the "function" of the Committee as follows:

> Assist the Board of Directors in overseeing (i) the integrity of the Corporation's financial statements; (ii) the independence, qualifications and performance of the Corporation's independent auditor; (iii) the performance of the Corporation's internal audit function; (iv) the Corporation's compliance and ethics programs; and (vi) the Corporation's enterprise risk management program.

96.    The "Responsibilities" section of the Audit & Risk Committee Charter outlines the responsibilities of the Audit & Risk Committee, in relevant part, as follows:

## A. Accounting and Reporting

1. **Review of Earnings Releases and Other Information.** Review and discuss with management the Corporation's earnings press releases, including the use of non-GAAP financial measures and any earnings guidance provided, before issuance. Discuss generally the types of financial information provided and the types of presentations to be made to analysts and rating agencies (such discussion need not occur prior to each disclosure).

2. **Review of Annual and Quarterly Reports.** Review and discuss with management and the independent auditors the Corporation's interim unaudited and annual audited financial statements, including disclosures made in management's discussion and analysis, the results of the independent auditor's review (or audit in the case of annual financial statements) and any other matters required to be communicated to the Committee by the independent auditor, prior to filing each Form 10-Q or 10K, respectively. Recommend to the Board whether the audited financial statements should be included with the Corporation's Form 10-K. The Committee shall also prepare the "Report of Audit Committee" contained in the annual Proxy Statement.

3. **Internal Controls.** Receive information from management about any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting. Review and discuss with management and the independent auditor, the report of management on internal control over financial reporting and the independent auditor's report on internal control over financial reporting prior to the filing of the Corporation's Form 10-K.

4. **General Oversight.** Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Corporation's financial

statements, including any significant changes in the Corporation's selection or application of accounting principles and any critical accounting estimates made in the course of preparing the financial statements.

\* \* \*

### E. Oversight of Compliance and Ethics

**1. <u>Compliance and Ethics Programs.</u>** Oversee the Corporation's compliance and ethics programs, including those related ethics, legal, and regulatory matters, and receive periodic reports on such programs from appropriate members of management, including information on any significant compliance and ethics issues and the budget and staffing for the Corporation's compliance and ethics function.

**2. <u>Compliance and Ethics Monitoring.</u>** Oversee the effectiveness of the process used by management to identify, investigate and address allegations of potential misconduct and violations of compliance and ethics policies, including the Corporation's Code of Ethics (or any successor code of conduct) and possible legal or regulatory violations.

**3. <u>Investigations and Remediation Efforts.</u>** Unless addressed by the Board or another Committee, oversee investigations and remediation efforts related to the Corporation's compliance and ethics program.

\* \* \*

### F. Oversight of Enterprise Risk Management

**1. <u>Enterprise Risk Management Program.</u>** Oversee the Corporation's enterprise risk management program to obtain an understanding of the primary enterprise risks facing the Corporation, including:

- management's process for identifying and assessing risks and, where appropriate,

employing strategies for risk mitigation; and

- the budget and staffing for the Corporation's enterprise risk management function.

**2.  Principal Business and Operational Risks.** Oversee the principal business and operational risks facing the Corporation, including:

- vendor risk management

- cybersecurity and information security

- privacy

- product safety, including food safety

- business continuity and disaster recovery.

**3.  Coordination of Risk Oversight.** Periodically review the Corporation's approach to risk identification, assessment and mitigation strategies with the Board to facilitate coordination with the activities of the Board and the other Board Committees.

\* \* \*

## H. Other

**1. Investigations.** Conduct any investigation that the Committee deems appropriate, with full access to all of the Corporation's records, facilities, personnel and outside advisors, and retain outside counsel, auditors and other consultants to advise the Committee for that purpose. . . .

\* \* \*

**5. Reporting to the Board.** Provide the Board with regular reports of the activities of the Committee.

## BREACHES OF DUTIES

97.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Target, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

98.     The Individual Defendants breached their fiduciary duties by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders.

99.     The Audit Committee Defendants had a duty to review the Company's earnings, press releases, and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Target's public statements and internal control functions.

100.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Target, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of Individual Defendants' improper course of conduct, the Company is now the subject of the Securities Action, which alleges violations of federal securities laws. As a

result, Target has expended, and will continue to expend, significant sums of money.

### DAMAGES TO TARGET

101. As a direct and proximate result of the Individual Defendants' misconduct, Target has suffered economic damage in the form of decreases in sales and a precipitous drop in the Company's price, as well as the continuing expenditure of significant sums of money to defend itself and its officers and directors in the Securities Action.

102. Such expenditures include, but are not limited to, legal fees associated with the aforementioned Securities Action filed against the Company for violations of the federal securities laws. Target will incur additional expenditures and economic harm due to, among other things, amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations, and payments associated with the aforementioned issues.

103. As a direct and proximate result of the Individual Defendants' misconduct, Target has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

104.   Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

105.   Plaintiff brings this action derivatively in the right and for the benefit of Target to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Target, unjust enrichment, and violations of the Exchange Act.

106.   Target is named solely as a nominal party in this action. This is not a collusive action and to confer jurisdiction on the Court that it would not otherwise have.

107.   Plaintiff is, and has been continuously at all relevant times, a stockholder of Target. Plaintiff will adequately and fairly represent the interests of Target in enforcing and prosecuting its rights, and, to that end, as retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

108.   A pre-suit demand on the Board of Target is futile and, therefore, excused. At the time of filing this action, the Board consists of 12 directors: Current Director Defendants (i) Cornell; (ii) Abney; (iii) Baker; (iv) Barrett; (v) Boudreaux; (vi) Edwards; (vii) Knauss; (viii) Leahy; (ix) Lozano; (x) Puma; (xi) Rice; and (xii) Stockton.

109.   Plaintiff did not make a demand on the Board prior to bringing

this stockholder derivative suit because, as set forth below, at least half of the Board (*i.e.* at least six directors) faces a substantial likelihood of liability and is therefore incapable of making an independent and disinterested decision to bring the claims herein.

### A. The Board Faces a Substantial Likelihood of Liability

110.   Demand is excused as to the entire Board, because all of the Current Director Defendants breached their fiduciary duties of loyalty by making false and misleading statements about the risk of consumer backlash, boycotts, and financial damage related to Target's ESG and DEI initiatives. Accordingly, the entire Board faces a substantial likelihood of liability for making materially false and misleading statements.

111.   Each of the Current Director Defendants knew or should have known of the false and misleading statements that were made on the Company's behalf and took no steps in a good faith effort to prevent the statements from being issued and/or correct the statements once they had been made. Instead, each of the Current Director Defendants authorized and/or permitted the false and misleading statements described herein to be distributed to shareholders and, as such, could not fairly prosecute this action even if they initiated it.

112.   Moreover, Defendants Abney, Boudreaux, Edwards, Puma, Rice, and Stockton, as members of the Audit & Risk Committee, reviewed and

approved the false and misleading statements issued by the Company. The Audit & Risk Committee Charter provides that it is responsible for the integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements. Thus, Defendants Abney, Boudreaux, Edwards, Puma, Rice, and Stockton were responsible for knowingly or recklessly allowing the issuance of the false and misleading statements regarding the risk of consumer backlash, boycotts, and resulting financial damage to the Company related to Target's ESG & DEI initiatives. Accordingly, Defendants Abney, Boudreaux, Edwards, Puma, Rice, and Stockton breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein and face a substantial likelihood of liability for their breaches of fiduciary duties, rendering demand upon them futile.

113. In addition, Defendants Baker, Barrett, Leahy, Lozano, and Stockton, as members of the Governance & Sustainability Committee, failed to adequately oversee social and political risks stemming from Target's ESG and DEI initiatives, as required to do by the Governance & Sustainability Charter. Accordingly, Defendants Baker, Barrett, Leahy, Lozano, and Stockton breached their fiduciary duty because they participated in the wrongdoing described herein. Thus, Defendants Baker, Barrett, Leahy, Lozano, and Stockton face a substantial likelihood of liability for their breaches of fiduciary duties and any demand upon them is futile.

114. Furthermore, each of the Current Director Defendants is named as defendants in the Securities Action, which has survived a motion to dismiss. Accordingly, for this additional reason, each of the Individual Defendants faces a substantial likelihood of liability for the misconduct alleged herein and demand is excused as futile.

## B. Demand is Further Excused Because Defendant Cornell is Not Independent

115. The principal professional occupation of Defendant Cornell is his employment with Target, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Defendant Cornell has served as the Company's Chairman and CEO since 2014 and, during the 2023 fiscal year, Defendant Cornell received $19,203,353 in total compensation from the Company. Accordingly, Cornell lacks independence from the other members of the Board due to his interest in maintaining his executive position at Target, as well as the substantial compensation he receives therefrom. This lack of independence renders Defendant Cornell incapable of impartially considering a demand to vigorously prosecute this action.

116. Moreover, as CEO, Defendant Cornell had the power and authority to control the contents of the Company's financial filings, press releases, and other market communications. He attested to being involved in the preparation

and delivery of the Company's SEC filings alleged herein to be misleading and had the ability to have them corrected and/or prevent their release. Defendant Cornell knew or recklessly disregarded the facts regarding the risk of the Company's 2023 Pride Campaign and the high likelihood that this would result in consumer backlash, boycotts, and financial damage to the Company, as described herein.

## FIRST CLAIM

### Against the Individual Defendants
*for Violations of Section 14(a) of the Exchange Act*

117.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

118.  The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

119.  Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national

securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

120.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

121.    In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy and 2023 Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2022 Proxy and 2023 Proxy, including, but not limited to, election of directors, ratification of an independent auditor, and the approval (on an advisory basis) of executive compensation.

122.    The false and misleading elements of the 2022 Proxy and 2023

Proxy led to the re-elections of the Individual Defendants, allowing them to breach their fiduciary duties to Target.

123.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 Proxy and 2023 Proxy.

124.    Plaintiff, on behalf of Target, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

125.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

126.    The Individual Defendants, by virtue of their positions with Target and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Target and officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Target to engage in the illegal conduct and practices complained of herein.

127.    Plaintiff, on behalf of Target, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants
*for Breach of Fiduciary Duties*

128.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

129.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Target's business and affairs as directors and/or officers of the Company.

130.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonably inquiry, oversight, and supervision.

131.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Target.

132.   The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

133.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

134.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes, even though conflicting facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

135.   The Audit Committee Defendants breached their duty of loyalty by approving the statements described herein which were made during their

tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

136.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Target has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to Target.

137.  Plaintiff, on behalf of Target, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants
*for Unjust Enrichment*

138.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

139.  By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Target.

140.  The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and

misleading statements, received bonuses, stock options, or similar compensation from Target tied to the performance or artificially inflated valuation of Target, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct during the Relevant Period.

141. Plaintiff, as a stockholder and a representative of Target, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

142. Plaintiff, on behalf of Target, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of Target and that Plaintiff is an adequate representative of the Company;

B. Finding that any demand upon the Board concerning the wrongdoing complained of herein would be futile;

C. Finding that the Individual Defendants have breached their fiduciary duties to Target;

D. Finding that the Individual Defendants have been unjustly enriched;

E.     Determining and awarding to Target the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

F.     Directing Target to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Target and its stockholders from a repeat of the damaging events described herein;

G.     Awarding Target equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of the Individual Defendants' trading activities or their other assets so as to assure that Plaintiff, on behalf of Target, has an effective remedy;

H.     Awarding Target restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

I.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees and experts' fees, costs, and expenses; and

J.     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on issues so triable.

Dated: January 24, 2025

**COOK LAW, P.A.**

/s/ William J. Cook
William J. Cook
610 East Zack Street, Suite 505
Tampa, FL 33602
(813) 489-1001
wcook@cooklawfla.com

**Lead and Local Counsel**

**LEVI & KORSINSKY, LLP**
Daniel Tepper (*pro hac vice forthcoming*)
Correy A. Suk (*pro hac vice forthcoming*)
Gregory M. Nespole (*pro hac vice forthcoming*)
33 Whitehall Street, 17th Floor
New York, NY 10004
T. 212.363.7500
dtepper@zlk.com
csuk@zlk.com
gnespole@zlk.com

*Attorneys for Plaintiff Ryan Murphy*